FILTER DYNAMICS INTERNATIONAL, INC., *et al.*, Plaintiffs-Appellants, *v.* ASTRON BATTERY, INC., *et al.*, Defendants-Appellees.

(No. 73-198;

Second District—May 8, 1974.

300

Alter, Weiss, Whitesel & Laff and Gottlieb & Schwartz, both of Chicago, and Donovan, Dichtl, Atten, Mountcastle & Roberts, of Wheaton, for appellants.

Leo J. Spivack, of Shulman & Spivack, and Charles L. Rowe, both of Chicago, for appellees.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

Filter Dynamics International, Inc., and its subsidiary, Battery Systems of Illinois, Inc. (referred to as FDI unless otherwise noted) sought to preliminarily enjoin the defendant, Astron Battery, Inc. (Astron), and the individual defendants, J. Brosilow, R. Brosilow and J. Levitt, from marketing automotive batteries in a display package which plaintiffs claim copied their own and from using allegedly misappropriated trade secrets. On defendants' motion at the close of plaintiffs' evidence on the hearing for the preliminary injunction, the court denied relief to the plaintiffs. They appeal from the interlocutory order of denial pursuant to Illinois Supreme Court Rule 307(a)(1). Ill. Rev. Stat. 1971, ch. 110A, par. 307 (a)(1).

On appeal plaintiffs contend the proof is sufficient to establish they are entitled to injunctive relief against defendants for acts of unfair competition under the Illinois Deceptive Trade Practices Act (Ill. Rev. Stat. 1971, ch. 121½, par. 311 *et seq.*) and the Illinois "Anti-Dilution" Statute (Ill. Rev. Stat. 1971, ch. 140, par. 22) and for misappropriation of certain trade secrets. Defendants respond by arguing that the numerous findings of the court justifying denial of the injunction are correct and not against the manifest weight of the evidence.

The first and primary issue presented is whether the marketing of defendants' prototype battery-display box constitutes unfair competition with plaintiffs' battery-display container (referred to as "Vu-Pak"). Plaintiffs claim their Vu-Pak, as equivalent to a trademark under the Illinois Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1971, ch. 121½, par. 311[1]), was infringed by defendants' prototype box in violation of the Act. Ill. Rev. Stat. 1971, ch. 121½, par. 312.[2]

The proof adduced by plaintiffs in support of this issue consisted of

---

[1] Par. 311 as pertinent here provides:

"*As used in this Act, unless the context otherwise requires:*

(1) 'article' means a product as distinguished from a trademark, label or distinctive dress in packaging;    *    *    *

(4) 'mark' means a word, name, symbol, device or any combination of the foregoing in any form or arrangement;    *    *    *

(7) 'trademark' means a mark used by a person to identify goods and to distinguish them from the goods of others;    *    *    *."

the testimony of their officers and employees and the testimony of defendant J. Brosilow who was called as an adverse witness under section 60 of the Civil Practice Act. Essentially, the testimony showed that FDI is engaged in the business of manufacturing and marketing automotive parts and accessories, and through its subsidiary, Battery Systems of Illinois, manufactures and sells batteries to retailers and distributors. Much of plaintiffs' battery sales are directed to the self-service mass merchandising market. The batteries are either labeled with an FDI proprietary name such as "LEE" or with the private labels of its merchant customers.

During 1972 plaintiffs sold approximately $2.5 to $3 million worth of automotive batteries, of which approximately $1 million worth were sold in plaintiffs' Vu-Pak display box. The total volume of replacement battery sales in the industry over the same period approximated $600 million. An estimated 20-25% of plaintiffs' batteries are sold under private labels rather than plaintiffs' proprietary labels.

Defendant Astron is a competitor of plaintiffs which also sells batteries to private label merchant customers. J. Brosilow and J. Levitt are the sole principals of Astron. The defendant R. Brosilow, J. Brosilow's uncle, is a carton broker or supplier of boxes. Until early 1972, before Astron was formed, J. Brosilow and Levitt were principals of World Battery Corporation. On May 1, 1972, shortly after J. Brosilow and Levitt left World Battery to form Astron, FDI acquired the assets of World Battery and with them organized Battery Systems of Illinois.

The development and design criteria for plaintiffs' battery display container began in January and February of 1971. Preliminary work on the original display package (called Vu-Pak 1) was done in June of 1971 and a package was put out by plaintiffs that summer. Vu-Pak 1 appeared in a November 1971 trade publication and was shown in a November 1971 Automotive Parts and Accessories Association (APAA) show in Chicago. The form of the original Vu-Pak remained unchanged but it was subsequently redesigned to reduce production costs and to increase its strength. The graphics of Vu-Pak 1, a red and white box with black

---

[2] Par. 312 provides in pertinent part:
"A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:

&ast; &ast; &ast;

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship approval or certification of goods or services;

&ast; &ast; &ast;

In order to prevail in an action under this Act, a complainant need not prove competition between the parties or actual confusion or misunderstanding."

&ast; &ast; &ast;

lettering and a black and white checkerboard stripe, was also changed in Vu-Pak 2. In June of 1972, plaintiffs began marketing their batteries in Vu-Pak 2.

Vu-Pak 2 is essentially a rectangular, corrugated, cardboard box with the front upper corner largely cut away to expose and display the battery. The box is about 12½ inches long, 9 inches high and 10½ inches wide. The cutaway portion takes 7 inches of the length off on top and 7 inches of the height in front, leaving a 2 inch strip covering the bottom front portion of the exposed battery. The sides of the cutaway portion of the box are marked by a straight diagonal edge extending up and back from the 2 inch strip in front to the remaining 5½ inches of the box top. The cutaway portions of the box remain attached to the box but are folded or tucked as flaps to the inside of the box. A large flap from the top of the box folds behind the exposed battery and separates the battery from the dry acid package which is stored in the back of the box, together with instructions and guarantee. The acid is not activated and added to the battery until the time of use.

The graphics, or color scheme and design of the box, consist principally of a pastel nine-striped 4-inch-wide rainbow over a black box background. The rainbow or stripe extends over the front, top, and sides of the box, curving on the top and sides and running straight at an angle on the front. The rainbow consists of three white, two green, two lavender, one yellow and one yellow over lavender stripes of varying widths. On the front strip of the box to the left side of the rainbow, written in lavender over the black background are the words "DRY CHARGED BATTERY". Underneath these in white letters are the words, "LIFE BEGINS WHEN ACTIVATED". On the top of the box following the curve of the rainbow are the words in white letters "FRESH POWER". On the sides of the battery container, written in the same colors as the rainbow, are the words "FRESH FRESH DRY CHARGED BATTERY", and in smaller letters, "LIFE BEGINS WHEN ACTIVATED" and "ACTIVATOR PACK AND INSTRUCTIONS INCLUDED".

Batteries sold in plaintiffs' Vu-Pak 2 container clearly expose either the LEE or private name label printed on the battery. The Vu-Pak 2 container itself is not marked with any brand name. Batteries sold in Vu-Paks are generally sold in the display rack with a number of the same label batteries side by side on shelves. Published brochures and advertisements including a television commercial submitted in evidence clearly show the LEE brand name on the battery and the rainbow on the Vu-Pak 2 container. As shown, the front rainbow stripe is always noticeable and the stripe on other portions of the box is noticeable in varying degrees depending on the particular advertisement. Other LEE products are dis-

played and advertised in different-shaped containers according to the nature of the product, but each container bears the same or a similar nine-striped rainbow usually over a black background.

Plaintiffs have spent over $200,000 in developing and advertising their Vu-Pak battery display package, of which $40,000 was allocated to design, printing, art work, construction and graphic costs and the balance to marketing and advertising directed to the mass retailer as well as to directly influence the consumer. Vu-Pak 2 had won three design and packaging awards.

The design was directed toward attracting the customer, allowing him to see the battery which he was purchasing and also to provide a carton for him to carry the battery and acid package home after purchase.

The testimony of J. Brosilow established that Astron started work on the concept of marketing batteries in display boxes in early April or late March of 1972. J. Brosilow was aware of plaintiffs' marketing efforts with Vu-Pak 1, but testified he was concerned about marketing a side-terminal battery instead of a regular post-type battery and therefore wanted a package to display this new type of battery. Six prototype boxes were made at his request and displayed at the APAA show in Los Angeles in November, 1972. At the time of the hearing the prototype boxes were the only ones defendants had made.

Defendants' prototype box is quite similar in form or shape to plaintiffs'. It has the cutaway upper front corner, leaving a 2-inch strip below and a 5½-inch box behind the display battery to carry the acid pack. The graphics of the box, however, are not similar to plaintiffs'. The color scheme is all red around the cutaway portions and black toward the back and bottom of the box, with a ¼-inch wide, straight white line separating the two colors. All lettering is straight and in white. The lower front strip says, "DRY CHARGED BATTERY" and below this "complete ready to install". On top of the box is lettered, "activator fluid pack included". The sides contain "100% FRESH POWER", and below this line, "the instant fluid is added". No brand name is labeled on the box. Five of defendants' boxes were displayed at the Los Angeles APAA show with a header-card that fits onto the box and describes the contents of the box. The sixth box was on a metal rack, with the header-card attached to the rack instead of the box. The batteries used in the display boxes were dummy batteries with side terminals.

Astron incurred almost no cost in the marketing research of its display box. J. Brosilow testified that he relied on his 15 previous years of experience in the battery business. He readily fashioned in court a type of display box similar in form to his prototype box and plaintiffs' Vu-Pak by cutting away the upper front corner of a plain battery box.

John Vargo, a corporate Vice-President of FDI, testified for plaintiffs that one of the goals in designing the Vu-Pak container was to create a package that was unique, distinctive and recognizable with whatever brand was sold in it. Plaintiffs wanted to create with Vu-Pak a subliminal effect for secondary purchase of the package. The customer would know the battery is available; he would recognize it in a certain fashion; and when he desired to purchase, would be stimulated to return to purchase plaintiffs' battery package. The customer would recognize the package even if used with several different private label brands because of the same shape display box he had seen before. On cross-examination, Vargo testified that the goal in selling batteries in Vu-Pak containers is to get the purchasers to believe from the package that when he purchases the private label battery he is purchasing a LEE battery despite the private brand name; that the goal was source identification and not brand identification; that while plaintiffs' retail merchant customers would not be confused between a LEE battery labeled as such in the Vu-Pak 2 display package and an Astron battery labeled as such in one of defendants' prototype boxes, a purchaser would be confused.

Other witnesses testified that the uniqueness of plaintiffs' battery sales program is caused by the graphics, by the construction of the box, and the advertising as well as the form of the box. Witnesses acknowledged that batteries manufactured by competitors usually are not sold side by side with plaintiffs' batteries, since the merchant chooses one line or the other to sell. There was also testimony that while plaintiffs have a side-terminal battery, their sales are presently very minimal but expected to grow in the future.

While plaintiffs' witnesses testified that over the past 20 years there has been no marketing of batteries with a visual pack like plaintiffs' for mass merchandising, the adverse witness Brosilow testified that two other companies, Bowers and Universal, had displayed batteries in cutaway packages similar in form to plaintiffs' Vu-Pak and defendants' prototype box. One of plaintiffs' witnesses, however, distinguished the Universal display box from its own because the Universal box was used for display purposes only and not to carry the battery home.

The order below essentially found as material here that plaintiffs' container has not acquired a secondary meaning because it has not been sufficiently advertised or identified by the consuming public; that plaintiffs' container is not capable of acquiring a secondary meaning because it is utilitarian in purpose; and that because the batteries are clearly labeled and the graphics of the containers are totally dissimilar, there is no likelihood that the consuming public will be deceived as to the source or origin of the batteries.

Plaintiffs first contend that the trial court erred in failing to find that the proof had established consumer recognition or secondary meaning of their Vu-Pak container because of its unique and original design and because it was the focus of all of plaintiffs' marketing activities, including a great variety and expense of promotional techniques used to bring it before the trade and the public. Plaintiffs argue that "slavish" copying by defendants is an admission that plaintiffs' container has acquired a secondary meaning and that defendants' copy is likely to confuse the consumer as to the source of the goods. They argue that even if the container was in part utilitarian, it is yet capable of having a secondary meaning; and that the proof need not show deception or palming off by defendants but need only show a likelihood of confusion which is not obviated by the fact that there may be differences in trade dress or labeling of the respective containers.

■■ Because the packaging of a product is not likely to cause confusion over the source or origin of the product unless the package has acquired a secondary meaning,[3] plaintiffs are required to establish that the shape or form of their Vu-Pak container has achieved identification in the minds of the consuming public with a particular person or producer. (Illinois Notes to S.H.A. (1973-74 supp.), ch. 121½, par. 312(2), p. 88; *Clairol, Inc. v. Andrea Dumon, Inc.* (1973), 14 Ill.App.3d 641 (by implication); *Mr. Gasket Co. v. Travis* (1973), 35 Ohio App.2d 65, 299 N.E.2d 906, 912-913, 915; *Lucien Lelong, Inc. v. Lander Co.* (2d Cir. 1947), 164 F.2d 395, 397; *Crescent Tool Co. v. Kilborn & Bishop Co.* (2d Cir. 1917), 247 F. 299, 300; Restatement of Torts, sec. 741 and comment h thereto; 1957 Ill. L.F. 677, 678.) Although the plaintiffs have the burden of proving that the public distinguishes the source of their batteries by the packaging or trade dress features which they claim have been imitated, they need not show that their specific identity as manufacturer of batteries displayed in Vu-Pak containers is known or recognized. *Spangler Candy Co. v. Crystal Pure Candy Co.* (7th Cir. 1965), 353 F.2d 641, 647; *Tas-T-Nut Co. v. Variety Nut & Date Co.* (6th Cir. 1957), 245 F.2d 3, 7; *Crescent Tool Co. v. Kilbourn & Bishop Co.* (2d Cir. 1917), 247 F. 299, 300.

Contrary to the court's finding, plaintiffs argue that their Vu-Pak 2 container .was shown to have acquired secondary meaning because it is

---

[3] Technical trademarks receive protection without a showing of secondary meaning if they are used prior to those which imitate them. *Tisch Hotels, Inc. v. Americana Inn, Inc.* (7th Cir. 1965), 350 F.2d 609, 614; *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division* (N.D. Ill. 1966), 261 F. Supp. 200, 204-205, *aff'd*, 394 F.2d 833; Restatement of Torts, sec. 717(2)(b) and comment f thereto; 3 Callmann, Unfair Competition, Trademarks & Monopolies (3d ed. 1969), sec. 77.1 pp. 340-341, 345; Note, 77 Harv. L. Rev. 888, 911 (1964); Vandenburgh, 59 Ill.B.J. 832, 836 (1971).

unique, and because it was the focus of their extensive marketing activity. Defendants respond that a more extensive, exclusive, and continuous use and promotion of the alleged trademark is required than that shown by plaintiffs before a secondary meaning is accorded to it; and that plaintiffs' promotion of its box was directed as much to the graphics as anything else.

■■ The criteria set forth for the establishment of secondary meaning are simply stated as a combination of elements such as long-term usage, considerable effort and expenditure by the producer toward developing a reputation and good will for the trademark, resulting in the conscious connection in the minds of the general public of that trademark to the producer of the product. *Wells Fargo & Co. v. Wells Fargo Express Co.* (D. Nev. 1973), 358 F. Supp. 1065, 1093; *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.* (E.D. Pa. 1972), 350 F. Supp. 1341, 1359, *aff'd*, 480 F.2d 917; 3 Callmann, Unfair Competition, Trademarks and Monopolies (3d ed. 1969), sec. 77.3, p. 349; 1957 Ill.L.F. 677, 679.

Plaintiffs' Vu-Pak container at the time of the hearing had not been on the consumer market long—approximately 1½ years. The extensive marketing plaintiff relies on as establishing secondary meaning was primarily if not entirely concerned with its current display package, Vu-Pak 2, which was put on the consumer market only months prior to the hearing. Plaintiffs' total battery sales for 1972 approximated $3 million, of which $1 million was attributable to Vu-Pak sales. Total replacement battery sales for the same period approximated $600 million. Although plaintiffs spent over $200,000 promoting their Vu-Pak, $40,000 of this figure went into development and design and not the establishment of consumer source identification with the Vu-Pak. An undisclosed but significant amount of the balance was expended in selling the display package to distributors and retailers through trade shows, brochures, and advertising in trade journals. As the testimony showed and plaintiffs' counsel stated in oral argument, plaintiffs' retail and wholesale customers are not likely to be confused as to the source of the goods they purchase to sell to the consumer. Therefore how much expense and effort was devoted by plaintiffs to impressing a secondary meaning upon the minds of the consuming public remains unclear, although the dollar amount must have been considerably less than $160,000.

■■ Plaintiffs have undertaken the burden of showing that their display container has achieved a secondary meaning generally, *i.e.*, on a nation-wide scale rather than in any particular locale. Their television commercial had not yet been broadcast in Illinois at the time of the hearing, plaintiffs apparently relying on the "spillover" effect of the commercial from other parts of the nation to establish Illinois contacts. Although plaintiffs' batteries displayed in Vu-Paks are sold in some Illinois stores,

plaintiffs did not produce evidence of any direct consumer marketing efforts that had taken place in Illinois. Considering the size of the national replacement battery market, the length of time that the Vu-Pak was on the market, the amount of Vu-Pak sales and the expenditures made by plaintiffs to establish secondary meaning on a nationwide basis, we conclude that the court did not abuse its discretion in finding that plaintiffs failed to show that their Vu-Pak had achieved sufficient secondary meaning, and therefore was not protectable.[4] *Ralston Purina Co. v. Thomas J. Lipton, Inc.* (S.D. N.Y. 1972), 341 F. Supp. 129, 134; *Mr. Gasket Co. v. Travis* (1973), 35 Ohio App.2d 65, 299 N.E.2d 906, 915.

Second, even assuming the Vu-Pak had achieved some secondary meaning in the minds of the consuming public, the court could have found as it did that the form alone of the Vu-Pak was not the salient or predominant feature with which prospective customers would identify batteries sold in plaintiffs' Vu-Pak container as emanating from a particular source. (See *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division* (N.D. Ill. 1966), 261 F.Supp. 200, 205-207, *aff'd*, 394 F.2d 833; 34 I.L.P. *Trademarks*, sec. 7, pp. 423-424.) Contrary to the testimony of plaintiffs' witnesses, brochures and advertisements entered into evidence as well as the Vu-Pak 2 battery container itself indicate that the graphics, particularly the nine-striped rainbow over a black background which appears on other LEE automotive products advertised in the brochures, may have been a more significant factor than the shape of the package in achieving consumer source recognition, if any, of plaintiffs' packaging.[5]

■■ Third, the nature of the connection between the form of plaintiffs' container and the source or origin of the batteries displayed therein that plaintiffs attempted to establish by its witnesses was not a conscious, but rather a subliminal recognition. What the testimony of plaintiffs' witnesses may have established if believed is that by using the same form as plain-

---

[4] Plaintiffs point to the distinctiveness or uniqueness of its container as helping to establish secondary meaning. The three awards, however, as evidence of this assertion, appear to be based on the plaintiffs' packaging program as a whole and not just the form of the Vu-Pak. The court found that the form alone of the Vu-Pak was not unique. Moreover, testimony at the hearing revealed that two other battery manufacturers, Bowers and Universal, had displayed batteries in containers similar in form to plaintiffs'. Finally, distinctiveness or uniqueness alone is not enough to establish secondary meaning. Distinctiveness relates to the capability of identifying particular goods apart from other similar goods; secondary meaning pertains to actual source identification. *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.* (E.D. Pa. 1972), 350 F. Supp. 1341, 1359; *Ralston Purina Co. v. Thomas J. Lipton, Inc.* (S.D. N.Y. 1972), 341 F. Supp. 129, 133.

[5] Plaintiffs' argument that the graphics of Vu-Pak 2 are not readily noticeable when the Vu-Pak is sold on a display rack is not only factually unsupportable, but also illogical in light of plaintiffs' expenditures and efforts in developing suitable graphics and their change-over from the graphics of Vu-Pak 1. If anything, the form of the Vu-Pak is rendered less distinct by side-by-side display.

tiffs' display container defendant Astron may be trading on subliminal images created by impressions on consumers who have previously seen plaintiffs' Vu-Pak displaying batteries at the retail level and plaintiffs' advertising of its Vu-Pak. This is not enough. Recognition of the secondary meaning must be conscious. (*Wells Fargo & Co. v. Wells Fargo Express Co.* (D. Nev. 1973), 358 F. Supp. 1065, 1093; *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.* (E.D. Pa. 1972), 350 F. Supp. 1341, 1359; 3 Callmann, Unfair Competition, Trademarks and Monopolies (3d ed. 1969), sec. 77.3, p. 349.) The consumer must recognize the Vu-Pak not only as a distinctive package which sells batteries; he must know from the package that batteries sold in it originate from a common source. (*Mars, Inc. v. Curtiss Candy Co.* (1972), 8 Ill.App.3d 338, 343; *Ralston Purina Co. v. Thomas J. Lipton, Inc.* (S.D. N.Y. 1972), 341 F. Supp. 129, 133.) The court below could have inferred from much of the testimony plaintiffs presented that the consumer may have some sort of recognition in the back of his mind that he has seen the Vu-Pak before and he may even associate it with a battery product apart from others, but not necessarily a battery product emanating from a familiar single source.

■■ Finally, any secondary meaning that plaintiffs seek to establish for their Vu-Pak package is largely destroyed by allowing private labels to be substituted on the battery itself in place of "LEE", plaintiffs' proprietary brand name. Plaintiffs have cited no authority and we are aware of none which has held that a secondary meaning can be established when a plaintiff permits those who distribute his product and use his package to apply their own proprietary labels to it and therefore lead the consumer to believe the product is not the plaintiffs' but that of another in whose store the product is sold. Rather the rule is to the contrary. A plaintiff who would enjoin others from imitation under trademark and unfair competition laws should not himself be guilty of misrepresenting the source of his own article. (Restatement of Torts, sec. 749 and comment f thereto; 87 C.J.S. *Trademarks*, sec. 86, pp. 310-311; see also Vandenburgh, Trademark Law and Procedure (2d ed. 1968), sec. 1.23, p. 36.) The labels on the battery are clearly displayed by plaintiffs' Vu-Pak. One of plaintiffs' witnesses stated that a primary indication of the source of any product is its label. The effect of the private labeling is therefore to vitiate the achievement of secondary meaning because the battery product is clearly labeled differently from the source which the plaintiffs seek to show their packaging denotes.[6]

---

[6] Although it is conceivable that under limited circumstances private labeling might not destroy the secondary meaning of an extremely strong packaging mark used in conjunction with private labels, such is not the case here.

Plaintiffs contend that defendant's copying of the form of the Vu-Pak container is an admission by them that the container has achieved secondary meaning. Plaintiffs argue that proof of copying, together with visual comparisons showing similarity in appearance between plaintiffs' and defendants' battery display containers, is sufficient to establish that the trade dress and packaging employed by the defendants is likely to deceive the public and cause confusion as to source, and thus obviates the necessity for showing plaintiffs' packaging has achieved secondary meaning. See *Clairol, Inc. v. Andrea Dumon, Inc.* (1973), 14 Ill.App.3d 641, 647; *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.* (9th Cir. 1960), 283 F.2d 551, 557-558; *My-T-Fine Corp. v. Samuels* (2 Cir. 1934), 69 F.2d 76, 77.

■■ Assuming, as plaintiffs claim, that defendants did copy the form of plaintiffs' Vu-Pak container, plaintiffs would still not be excused from establishing by direct evidence that a secondary meaning had attached to the form alone of their Vu-Pak. As stated earlier the predominant source identification features of plaintiffs' packaging seem to be the labels, which are readily visible on the batteries displayed in Vu-Paks or defendants' prototype box, and the graphics or nine-striped rainbow which appears on other LEE automotive products as well. Copying features of plaintiffs' packaging which are not primary determinants of consumer source association of the product cannot presumptively establish either likelihood of confusion or secondary meaning. See *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division* (N.D. Ill. 1966), 261 F. Supp. 200, 205-207, *aff'd*, 394 F.2d 833; 34 I.L.P. *Trademarks*, sec. 7, pp. 423-424.

■■ Copying the form of plaintiffs' package is also permissible under the functionality doctrine. Imitation of the packaging of a competitor's product may be actionable only if the imitated features of the package are not primarily or at least substantially functional. (*Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.* (9th Cir. 1960), 283 F.2d 551, 555; *Schwinn Bicycle Co. v. Murray Ohio Manufacturing Co.* (M.D. Tenn. 1971), 339 F. Supp. 973, 980, *aff'd*, 470 F.2d 975; Vandenburgh, Trademark Law and Procedure (2d ed. 1968), sec. 1.21(b), pp. 12-13; 3 Callmann, Unfair Competition (3d ed. 1969), secs. 77.4(b), 77.4(e)(1), pp. 366, 386, 388.) Functional in this sense means any purpose other than a trademark purpose, *i.e.*, other than identification of the source of the goods. (*Pagliero v. Wallace China Co.* (9th Cir. 1952), 198 F.2d 339, 343.) Functional features include those which contribute to efficiency or economy in manufacture and handling through the marketing process, and those which contribute to the product's (or container's) utility, durability or effectiveness or to the ease with which it serves its function or

is handled by users. Restatement of Torts, sec. 742 and comment a; 3 Callmann, Unfair Competition (3d ed 1969), sec. 77.4(e)(1), p. 385; Note, 77 Harv. L. Rev. 888, 909 (1964).

Applying these functional considerations to the shape of plaintiffs' battery display container, no other conclusion can be reached but that the shape of plaintiffs' Vu-Pak is primarily if not totally fitted for the utilitarian purposes set out above. In fact such was the criteria plaintiffs used in designing their Vu-Pak. The open front and top of the Vu-Pak container expose the battery and the label thereon for display purposes, and the diagonal side edges of the box enclose the battery for strength and carrying purposes. Other designs might be more costly, less efficient and less durable. The shape is not unusual (compare Haig & Haig "Pinch" bottle or Michelob bottle), and contains no embellishments such as curved edges, bulges or extensions which would clearly depart from functional design and serve primarily to designate source or origin. Under these circumstances the functionality doctrine precludes protection of any incidental source association that might be generated by the shape of plaintiffs' Vu-Pak battery display container.[7]

Even assuming plaintiffs had shown or need not show their Vu-Pak has achieved a secondary meaning, we would have to reject plaintiffs' argument that the marketing of defendants' prototype box will cause likelihood of confusion or misunderstanding as to the source of goods under the Illinois Deceptive Trade Practices Act (Ill. Rev. Stat. 1971, ch. 121½, par. 312(2)). Plaintiffs emphasize that the form of the container as opposed to the graphics is the keystone in the customer's association of plaintiffs' package to an origin. Thus, they reason that defendants' box, identical in form to plaintiffs', will likely cause confusion if the marketing of it is not enjoined.

The similarity of trademarks is to be judged by a consideration of the entire mark, and where the charge is one of unfair competition the whole appearance or dress of a product must be considered. (*Mars, Inc. v. Curtiss Candy Co.* (1972), 8 Ill.App.3d 338, 343; *Ye Olde Tavern Cheese Products Inc. v. Planters Peanuts Division* (N.D. Ill. 1966), 261 F.Supp. 200, 205-206, 207, *aff'd*, 394 F.2d 833.) A side-by-side comparison is not necessarily controlling to determine likelihood of confusion; rather the actual purchasing conditions and their effect upon the prospective customer must be considered. (*Alberto-Culver Co. v. Andrea Dumon, Inc.*

[7] Because we hold that the functionality doctrine as applied to plaintiffs' Vu-Pak container precludes any relief, we do not reach defendants' contention that the package is a product and therefore protectable only under federal patent and copyright laws. See *Sears, Roebuck & Co. v. Stiffel* (1964), 376 U.S. 225; *Compco Corp. v. Day-Brite Lighting, Inc.* (1964), 376 U.S. 234.

(7th Cir. 1972), 466 F.2d 705, 708-709; *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division* (N.D. Ill. 1966), 261 F. Supp. 200, 205, *aff'd,* 394 F.2d 833; 34 I.L.P. *Trademarks,* sec. 7, p. 424.) Evidence of actual confusion is not necessary. Ill. Rev. Stat. 1971, ch. 121½, par. 312.

In the instant case the circuit court had before it the respective display containers and batteries they displayed, and found the form of the containers the same, but their graphics totally dissimilar, the battery products displayed clearly d'fferent, and the batteries themselves clearly labeled as to source, so that the consuming public is not likely to be deceived.

After reviewing the record and examining the exhibits we are convinced that these findings are correct and not an abuse of discretion. The graphics of plaintiffs' box, a nine-striped curved rainbow over a black background, is readily distinguishable from defendants' red and black box. If the defendants' batteries are displayed side by side on display racks as plaintiffs contend is usually the case, the graphics visible would be mainly the red of the upper front portion of defendants' prototype box. This contrasts with plaintiffs' pastel nine-striped rainbow over black which would be visible in a similar display, although the displays would seldom be together in the same store at the same time. Moreover, the evidence showed defendant was attempting to market only a side-terminal battery which is distinct from the regular post-type battery displayed in all the advertising exhibits plaintiffs entered into evidence. Although plaintiffs are also selling a side-terminal battery, such sales constitute only a small percentage of its battery sales. Nor was there any direct evidence that plaintiffs ever marketed or advertised its side-terminal batteries in Vu-Pak containers. The nature of the product sold, if noticeably different from its competitor and displayed so as to become part of the packaging and trade dress, is a significant factor from which a court may infer that a prospective customer would not likely be confused.

Moreover, the batteries are labeled, and these labels are readily observable to the prospective purchaser. In fact the batteries, and particularly the labels on them, appear to be the central aspect of the visual motif created by the display containers. On display the containers merely frame the batteries, which in turn form a black background for the bright and boldly lettered labels imprinted on them. Plaintiffs do not contend the labels themselves are similar. The labels consist of the proprietary brand names of plaintiff FDI (such as "LEE") or defendant ASTRON or those of the private label retailers. Because the labels on the batteries are so prominently displayed by plaintiffs' Vu-Pak and defendants' prototype box, in d'splays where the proprietary brand names are used, the possibility of confusion is minimal. (*Ball v. Siegel* (1886), 116 Ill. 137; *Kellogg Co. v. National Biscuit Co.* (1938), 305 U.S. 111, 83 L.Ed. 73, 120-

121, 59 S.Ct. 109, 114; *Pocket Books v. Meyers* (1944), 292 N.Y. 58, 54 N.E.2d 6, 8; see, in addition, *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division* (N.D. Ill. 1966), 261 F.Supp. 200, 205-206, *aff'd*, 394 F.2d 833.) And where private labeling is used, the confusion generated by the conflict between the label and source connotations of the packaging would, as stated earlier, bar plaintiffs from obtaining relief from infringement or unfair competition by defendants.

■■ There was testimony by plaintiffs' witnesses that consumers might be confused as to the source or origin of batteries sold in defendants' prototype box. The testimony was not based on actual instances of confusion or consumer surveys, but was the opinions of the witnesses themselves as advertising and marketing experts. The credibility or weight of their testimony in establishing the essential element of likelihood of confusion is subject to discount because they hold important positions with the plaintiffs. (*Mr. Gasket Co. v. Travis* (1973), 35 Ohio App.2d 65, 299 N.E.2d 906, at 915, n. 25 and accompanying text.) Moreover, a reading of the record gives this court the distinct impression that these witnesses, intimately involved in marketing and advertising techniques and the promotion of their Vu-Pak concept, were presenting that concept to the court as they would to plaintiffs' retail merchant customers. Marketing goals in the development and promotion of plaintiffs' Vu-Pak battery container were frequently interspersed with and difficult to distinguish from the actual marketing impressions thought to be created and conclusions concerning consumer behavior based on them. Simply stated, the court may not have viewed plaintiffs' witnesses in establishing the key points of their case either as objective or persuasive.

■■ Plaintiffs further argue that the Illinois "Anti-Dilution" Statute (Ill. Rev. Stat. 1971, ch. 140, par. 22) does not even require confusion as to the source of goods if there exists a likelihood of injury to business, reputation or of dilution of the distinctive quality of a mark because of the subsequent use by another of the same or any similar mark. Plaintiffs' reliance on the Illinois Anti-Dilution Statute does not aid them. The Anti-Dilution Statute is designed to protect a strong trade name or mark from use by another and hence dilution regardless of competition between the parties. (*Edgewater Beach Apartments Corp. v. Edgewater Beach Management Co.* (1973), 12 Ill.App.3d 526, 534; *Alberto-Culver Co. v. Andrea Dumon, Inc.* (7th Cir. 1972), 466 F.2d 705, 709; see, in addition, Palmatier, 50 Chi. Bar Rec. 400, 402.) Dilution of a particular trademark can occur even though there may be no likelihood of confusion because the parties are not in competition; but where the parties are in competition and the plaintiff could not obtain relief under the traditional laws of infringement and unfair competition, he will not be able to obtain relief under

the Anti-Dilution Statute. *Edgewater Beach Apartments Corp v. Edgewater Beach Management Co.* (1973), 12 Ill.App.3d 526, 534; *Alberto-Culver Co. v. Andrea Dumon, Inc.* (7th Cir. 1972), 466 F.2d 705, 709; *Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division* (N.D. Ill. 1966), 261 F. Supp. 200, 207-208, *aff'd*, 394 F.2d 833.

Plaintiffs contend that the trial court's additional finding that none of the defendants misappropriated confidential information or good will of the plaintiffs is against the manifest weight of the evidence. We do not agree.

Robert Brown, a warehouse manager for plaintiffs, testified that on May 1, 1972, R. Brosilow came to the witness's office to discuss container needs; that he noticed samples of the Vu-Pak 2 box, questioned the witness about them and asked for a sample box for quotation. Brown refused the request because the box was not yet public or released for quotation. At the office in Brown's presence Brosilow examined the sample carefully, unfolded it and measured it. On May 16, R. Brosilow visited the witness again and asked more questions about the Vu-Pak container, again asked for a sample and was told it was still a secret. On cross-examination, the witness testified that he did not consider Brosilow's actions unusual because Brosilow could not give a quotation without doing the things which he did. The witness also testified that plaintiffs' Vu-Pak 1, which had been used for about a year prior to May 1, 1972, was similar in form or shape to plaintiff's current display package, Vu-Pak 2. Vu-Pak 2 was placed on the market in June 1972.

Margaret Gerrity, a former employee of World Battery, and, at the time of trial an employee of the plaintiffs, testified that while working at World Battery she was asked in January or February of 1972 by J. Brosilow to copy what she characterized as confidential price lists and customer account cards. The instruction was given in the presence of four other people.

J. Brosilow testified under section 60 of the Civil Practice Act that he saw plaintiffs' display box at the 1971 APAA show in Chicago and he was aware of what FDI and everybody else in the battery business was doing. Although he conferred with R. Brosilow in late May or early June of 1972 on the development of his prototype display box and ordered samples from him, another company was engaged to design and supply the prototype boxes. R. Brosilow acted as broker. He testified that Astron buys about 20% of its cartons from R. Brosilow.

The only evidence that J. Brosilow may have appropriated customer and price lists for use at Astron is Margaret Gerrity's testimony. As a former employee of World Battery she was asked by J. Brosilow in the presence of four other employees to copy allegedly confidential price lists

and customer account cards. This was a month or two before J. Brosilow left World Battery to form Astron. No evidence was presented to show J. Brosilow brought with him or used the copied information at Astron. ■■ The evidence presented is totally circumstantial and creates only a suspicion that World Battery's confidential customer and price lists were misappropriated for use at Astron. In the absence of any direct evidence showing any of the defendants actually misappropriated customer and price lists of World Battery, the circumstantial evidence presented by plaintiffs should be clear and convincing. (Cf. *Bimba Manufacturing Co. v. Starz Cylinder Co.* (1969), 119 Ill.App.2d 251, 267.) Not only was the trial court's finding on this matter correct, but a contrary finding in favor of plaintiffs by the court below would be clearly contrary to the manifest weight of the evidence. See *James C. Wilborn & Sons, Inc. v. Heniff* (1968), 95 Ill.App.2d 155, 162-163; *Kalnitz v. Ion Exchange Products, Inc.* (1971), 2 Ill.App.3d 158, 161-162.

■■ Nor is there merit in the plaintiffs' contention that the court erred in finding in effect that defendants did not wrongfully appropriate the construction details of plaintiffs' Vu-Pak 2 battery-display container. Plaintiffs' claim here involves the law of trade secrets; it is not concerned with deceptive trade practices or consumer confusion as to the source or origin of goods, and it is not concerned with the form or shape of the Vu-Pak, which remained unchanged from plaintiffs' publicly displayed Vu-Pak 1.

Testimony at the hearing showed plaintiffs changed the construction of their Vu-Pak 1 carton making Vu-Pak 2 stronger, more durable and less expensive to produce and use. Before Vu-Pak 2 was made public, R. Brosilow on visits to plaintiffs' warehouse on May 1 and 16, 1972, examined and measured the box in his capacity as a carton broker for plaintiffs. Plaintiffs point to the fact that R. Brosilow was also a carton broker for Astron and his nephew, J. Brosilow; that shortly after R. Brosilow's visits to plaintiffs' warehouse office in May, he was consulted by J. Brosilow on the development of defendants' prototype box; and that J. Brosilow procured Astron's prototype boxes through R. Brosilow.

The record is insufficient to show misappropriation of a trade secret. Plaintiffs failed to produce evidence specifying the amount of time, cost and degree of engineering effort required to produce the improved construction of Vu-Pak 2. Although the figure $40,000 was given in connection with the design, printing, art work, and graphic as well as construction costs of developing both Vu-Paks, from the invoices submitted into evidence no further breakdown of this figure can be made with certainty to determine developmental costs and effort expended on construction details alone. Nor does the record disclose how much of the construction

details of Vu-Pak 2 are simply common knowledge or the logical application of known skills to one experienced in the carton business, such as R. Brosilow, who wishes to construct a box shaped and designed to function as the ones in question. (See *Bimba Manufacturing Co. v. Starz Cylinder Co.* (1970), 119 Ill.App.2d 251, 263-264.) Finally, plaintiffs failed to produce any testimony to show that variations in construction between their box and defendants', although seemingly minor to the eye of one untrained in the engineering of boxes, are not in fact significant variations. In the absence of more certain evidence on the degree of skill and effort expended by plaintiffs to develop the construction of Vu-Pak 2, this court cannot assess whether a trade secret was involved, let alone misappropriated. See *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 546-547; *The Vendo Co. v. Stoner* (1969), 105 Ill.App.2d 261, 278; *Schwalm Electronics, Inc. v. Electrical Products Corp.* (1973), 14 Ill. App.3d 348, 353.

■■ Second, the ease with which the construction details of plaintiffs' Vu-Pak 2 container could be reproduced under plaintiffs' theory of the case makes their status as a trade secret questionable. (See Restatement of Torts, sec. 757, comment b, p. 6 quoted in *ILG Industries, Inc. v. Scott* (1971), 49 Ill.2d 88, at 93; *Bimba Manufacturing Co. v. Starz Cylinder Co.* (1970), 119 Ill.App.2d 251, 264, 265.) The informational data comprising the claimed trade secret was not obtained from blueprints, drawings, or other specifications as is usually so in cases of this nature (see, e.g., *ILG Industries, Inc. v. Scott* (1971), 49 Ill.2d 88; *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill.2d 379; *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill.App.2d 350); it was allegedly obtained simply by examining the box, unfolding it, and measuring it in the course of two visits to plaintiffs' warehouse office. Normally matters which are readily and completely disclosed by the product itself cannot constitute a trade secret (*ILG Industries, Inc. v. Scott* (1971), 49 Ill.2d 88, 93); and since plaintiffs' Vu-Pak 2 was publicly released a short time after its construction details were allegedly misappropriated, it is difficult to see how, in any event, plaintiffs were damaged.

Plaintiffs have also contended that the court should have granted them a temporary injunction as a matter of law because defendants failed to answer plaintiffs' verified complaint. (See *H.K.H. Development Corp. v. Metropolitan Sanitary District* (1964), 47 Ill.App.2d 46, 51-52; Ill. Rev. Stat. 1971, ch. 110, par. 40(2).) By proceeding to the hearing and producing evidence on the undenied allegations, plaintiffs waived their right to have the injunction decided on the basis of the complaint alone. *Slezak v. Fleming* (1946), 392 Ill. 387, 388; *Maddox v. MFA Life Insurance Co.* (1971), 132 Ill.App.2d 109, 114; *County of Winnebago v. Willsey* (1970),

122 Ill.App.2d 149, 154; *People v. Boening* (1966), 68 Ill.App.2d 1, 14.

The plaintiffs, at the close of their evidence, had not established the probability of ultimate success on the merits of their case which is a prerequisite to the issuance of the preliminary injunction. (See *Schlicksup Drug Co., Inc. v. Schlicksup* (1970), 129 Ill.App.2d 181, 186; see also *Mars, Inc. v. Curtiss Candy Co.* (1972), 8 Ill.App.3d 338, 341.) The court below therefore properly denied plaintiffs the requested injunctive relief.

The judgment of the trial court is affirmed.

Affirmed.

GUILD and RECHENMACHER, JJ., concur.