WALTER ROBACKI, Plaintiff-Appellant, *v.* ALLSTATE INSURANCE COMPANY, Defendant-Appellee.

First District (1st Division)  No. 82—2044

Opinion filed August 20, 1984.—Rehearing denied October 10, 1984.

BUCKLEY, P.J., dissenting.

Raymond P. Concannon, Ltd., of Chicago, for appellant.

Sonnenschein, Carlin, Nath & Rosenthal, of Chicago (Duane C. Quaini, Robert C. Johnson, and Alan M. Posner, of counsel), for appellee.

JUSTICE GOLDBERG delivered the opinion of the court:

A three-count complaint filed by Walter Robacki (plaintiff) against Allstate Insurance Company (defendant) alleged that defendant committed fraud, violated the Uniform Deceptive Trade Practices Act (Uniform Act) (Ill. Rev. Stat. 1983, ch. 121½, par. 312), and committed fraudulent concealment, all in connection with the sale of automobile insurance coverage. The trial court dismissed counts I and III and entered summary judgment for defendant on count II. Plaintiff appeals.

## I

Counts I and III of the complaint contain similar allegations and are based upon the same facts. Plaintiff alleged he had purchased an automobile insurance policy from defendant which expired August 18, 1975. The policy covered personal injury protection (PIP), comprised of Basic PIP coverage and Excess PIP coverage. Each form of PIP coverage included three types of benefits: (1) medical, funeral and hospital expense; (2) disability; and (3) loss of services.

Shortly before plaintiff's policy expired, defendant mailed to plaintiff certain documents which plaintiff refers to as "Replacement Papers." These papers explained that PIP was to be discontinued, but defendant would make other coverages available. They consist of two letters from defendant: an "Explanatory Pamphlet" outlining the terms of the new coverages, and a brochure listing new death indem-

nity and disability income provisions. The letters urged plaintiff to replace his PIP coverages with one or more of these three new coverages: (1) personal medical payment coverage; (2) automobile death indemnity coverage; and (3) automobile disability income coverage. Plaintiff alleged he elected to replace his PIP coverage with the three new coverages.

Counts I and III allege that defendant's scheme was accomplished by the use of deceptive and misleading statements contained in these "Replacement Papers." Plaintiff alleged these various statements led him to believe the new coverages would be the same as the old PIP coverages.

Plaintiff also alleged that on October 31, 1976, plaintiff was injured by an automobile. The injuries plaintiff received prevented him from continuing in his employment. Plaintiff alleged his claim for disability benefits of $12,700 was completely denied.

Plaintiff seeks reformation of the policies to include the discontinued coverages and also full payment of plaintiff's claims under the terms of the discontinued provisions.

## II

The first problem here is determination of the legal relationship between these parties. Plaintiff cites a number of Illinois cases in support of his contention that a fiduciary relationship existed between defendant and plaintiff. See, *e.g.*, *Simmon v. Iowa Mutual Casualty Co.* (1954), 3 Ill. 2d 318, 121 N.E.2d 509; *Harvey v. Johnson* (1975), 30 Ill. App. 3d 750, 332 N.E.2d 680; *Ledingham v. Blue Cross Plan for Hospital Care of Hospital Service Corp.* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540, *rev'd on other grounds* (1976), 64 Ill. 2d 338, 356 N.E.2d 75; and *Allstate Insurance Co. v. Keller* (1958), 17 Ill. App. 2d 44, 149 N.E.2d 482.

None of these cases deals with the question of whether a fiduciary relationship exists between an insurance company and its insured. *Simmon*, *Harvey*, and *Allstate Insurance Co.* describe the importance of automobile insurance in the modern world and underscore the degree to which insurance contracts are "cloaked with a public interest." (*Allstate Insurance Co. v. Keller* (1958), 17 Ill. App. 2d 44, 49.) These discussions were all within the context of the duty of the insured to cooperate with an insurance company as distinguished from any duty of the insurance company to its insured.

Only *Ledingham* discusses the duty of an insurance company to its insured. There, the insured plaintiff brought an action against his insurer based upon wrongful denial of benefits by the company under a

health service policy. The plaintiff sought both actual and punitive damages. Proceeding upon a common law theory, the court concluded that, while the insurer did have an implied duty of good faith and fair dealing, the denial of benefits in that case was not in bad faith. *Ledingham v. Blue Cross Plan for Hospital Care of Hospital Service Corp.* (1975), 29 Ill. App. 3d 339, 352.

■■ The duty of good faith and fair dealing described in *Ledingham* applied within the context of the right of the insured to punitive damages for wrongful denial of benefits under a policy of health insurance. *Ledingham* does not support plaintiff's contention here that defendant owed him a fiduciary duty. While a fiduciary relationship exists between an insured and a broker who acts as the agent for the insured (see *Black v. Illinois Fair Plan Association* (1980), 87 Ill. App. 3d 1106, 409 N.E.2d 549), our research has revealed no Illinois case holding that such a relationship exists between an insurance company and its insured. An implied duty of good faith and fair dealing has never been held to constitute a fiduciary duty.

Further, there is no basis for concluding that defendant here breached a duty of good faith and fair dealing. As discussed below, the record in this case demonstrates that defendant acted in good faith in providing plaintiff with copies of all of the actual provisions of the new coverages.

Plaintiff also relies upon *Fawcett v. Sun Life Assurance Co. of Canada* (10th Cir. 1943), 135 F.2d 544. That case dealt with the actionability of representations as to matters of law. No such problem is involved in the case at bar. We conclude there was no fiduciary relationship between the parties hereto.

### III

Plaintiff contends that defendant made representations which were intended to deceive and mislead policyholders about new coverage. We find there is no representation of any kind by defendant that the new coverage was identical to or even the same as the previous coverage. The only statement made by defendant in this regard is that the two coverages are "similar." This is a broad statement.

Plaintiff's depositions reveals him to be a person of good intelligence. He is approximately 70 years old, and was born in America. He has a grammar school education and one year of high school. In addition, he lived in Poland for some time, during which he had two more years of high school education. Plaintiff has been employed in the printing business for many years. Prior to plaintiff's disability, he was supervisor of the shipping room of a printing and packaging company.

Plaintiff testified he does not read policies but simply glances over them and files them away. He assumed that the policy which he received from the defendant was the same as his previous policy. There is nothing in the record to show that plaintiff ever sought assistance of any kind, expert or otherwise, in understanding the new policy provisions.

Generally speaking, it appears to us that the new coverages apply to the same general risks as the old. The new policy is, in some respects, more restrictive in its coverage, but not in all respects. For example, as regards total disability, the test under the former coverage was whether the injuries prevented the policyholder from engaging in his ordinary occupation. The new coverage provides benefits for total disability during the first year after its commencement if the insured is unable to perform every duty pertaining to his occupation, but provides benefits for subsequent years only if the insured is prevented from engaging in any occupation or employment for wage or profit. Plaintiff concedes he received, without prejudice, $5,200 for disability. This represents one year of benefits at the policy rate of $100 per week. However, the issue here is not whether there were differences between the old and new coverages. The question is whether plaintiff was taken advantage of so that the policy should be reformed to give plaintiff full payment of his claims.

■ Counts I and III of the complaint pray for reformation of the present policy. Actually, the legal basis of reformation of a contract is that "some provision that was not agreed upon was inserted either through mutual mistake or through the mistake on the part of one party and fraud on the part of the other." (*Jones v. Eagle II* (1981), 99 Ill. App. 3d 64, 74, 424 N.E.2d 1253, and cases there cited.) No such situation is alleged in the instant case.

In addition, an insurance policy is, in a limited sense, a commercial agreement. This court has held that, "[i]n the absence of ambiguous language, this court has no legal basis to support a judicial reformation of a commercial agreement." (*Wishnoff v. Guardian Savings & Loan Association* (1975), 34 Ill. App. 3d 107, 110, 339 N.E.2d 494, appeal denied (1976), 62 Ill. 2d 592.) No such situation exists in the instant case.

■ The legal requirements for an action for fraudulent misrepresentation have been repeatedly stated. (See, *e.g., Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599.) Examining these requirements, we find in the case at bar no false statement of a material fact which is known to be false by the party making it. There can be no cause of action based on plaintiff's reliance on the truth of

statements made because none of the statements in question are alleged to be false. Of course, there was an intent on the part of defendant to induce the plaintiff to act. But this single element is apparent in any advertisement or in virtually any sale of goods. Also we find no damage to plaintiff resulting from any reliance upon any false statement made by the defendant. There is no evidence of any false statement in any of the papers sent by defendant to the plaintiff.

In addition, no fraud is properly alleged in this case. Plaintiff had "ample opportunity to ascertain the truth of the representations." (*Schmidt v. Landfield* (1960), 20 Ill. 2d 89, 94, 169 N.E.2d 229; see also *Kusiciel v. LaSalle National Bank* (1982), 106 Ill. App. 3d 333, 435 N.E.2d 1217.) Plaintiff had the "burden of knowing the contents of [his] insurance policies \*\*\*." (*Foster v. Crum & Forster Insurance Cos.* (1976), 36 Ill. App. 3d 595, 598, 345 N.E.2d 49.) We necessarily conclude that the trial court correctly dismissed counts I and III of plaintiff's complaint.

## IV

Count II of the complaint re-alleges all of the paragraphs of count I, and adds that defendant's actions violated the Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1983, ch. 121½, par. 312), which provides in part:

"A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:

\* \* \*

(5) represents that goods or services have sponsorship, approval, characteristics, uses, benefits, or qualities that they do not have \*\*\*.

\* \* \*

(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

Plaintiff's motion for summary judgment is based primarily upon these two statutory provisions.

Defendant urges that the Uniform Deceptive Trade Practices Act does not authorize a monetary award. In a reply filed by plaintiff to defendant's motion for summary judgment on count II, plaintiff urges that the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1983, ch. 121½, par. 216 *et seq.*) is coordinated together with the Uniform Act. (See Ill. Rev. Stat. 1983, ch. 121½, par. 262.) Under the view we take of the case, we need not resolve this dispute. In our opinion, the trial judge properly denied plaintiff's motion for summary judgment on count II and allowed defendant's motion for

summary judgment. In other words, the same result must be reached upon consideration of either or both statutes. In fact, virtually the same reasoning above set forth, regarding counts I and III of plaintiff's complaint, is decisive with reference to the present issue.

Plaintiff cites two cases pertaining to this portion of the appeal. In *Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d 190, 380 N.E.2d 1040, the opinion is primarily concerned with the elements of fraudulent misrepresentation, not applicable to the instant case. The only reference to the Consumer Fraud Act is to describe it as an attempt "to eradicate all forms of deceptive and unfair business practices." (64 Ill. App. 3d 190, 198.) The second case, *Filter Dynamics International, Inc. v. Astron Battery, Inc.* (1974), 19 Ill. App. 3d 299, 311 N.E.2d 386, *appeal denied* (1974), 56 Ill. 2d 586, involves primarily injunctive relief from confusion resulting from similar packaging. The issue there was whether the package had "acquired secondary meaning." 19 Ill. App. 3d 299, 307.

As the trial judge correctly pointed out, the case must be viewed in the context of the totality of information available to plaintiff. Our careful study of all of the so-called replacement papers convinces us there is no element of deception in the dealings between these parties. It must be stressed that defendant provided plaintiff with a complete explanatory pamphlet. This document outlines all of the new coverages and is a clear summary of the provisions of the new policy. In our opinion, it eliminates any possibility of confusion or misunderstanding. Plaintiff testified in his deposition that when he first received the policy he was familiar with the coverages but he forgot the policy provisions themselves because "I don't read them."

Actually the record shows that plaintiff received a new policy from defendant on August 18, 1975. The automobile accident in which plaintiff was involved took place on October 31, 1976. Every year plaintiff received another policy from the defendant. This continued at least up to and including the time that plaintiff's deposition was taken on May 14, 1981. Plaintiff testified on his deposition that he still had the same coverage on his policy and the same limits that he had at the time of the accident. Plaintiff testified he was familiar with the coverage of these policies but he forgot the policy provisions themselves.

Plaintiff specifically stated that he was familiar with the provisions as the policies came. It was never his practice to read any of the policies at any time, but he simply went over them or looked at them and then filed them away. Regarding the new policy, plaintiff specifically stated, "I glance over it" and also, "I don't read them." Plaintiff testified he received $20,167.19 for medical expenses from defendant. Also

defendant paid him $5,200 in disability benefits accepted by plaintiff without prejudice to his claim for additional benefits. This testimony completely negates any possibility of deception or misunderstanding.

The dissent relies strongly upon *Glazewski v. Allstate Insurance Co.* (1984), 126 Ill. App. 3d 401. We find *Glazewski* readily distinguishable from the case at bar. As carefully pointed out in *Glazewski*, plaintiff there alleged that the defendant insurers marketed underinsured motorist coverage which simply duplicated existing coverage and which was therefore worthless. (126 Ill. App. 3d 401, 405.) Completely to the contrary, in the case at bar it is undisputed that the coverage offered by defendant was valuable and did not constitute the type of "phantom" coverage which we rejected in *Glazewski.* The issue in *Glazewski* was whether the stricken complaint stated a cause of action. The issue in the case before us is whether defendant was entitled to summary judgment based upon all of the matters before the trial court, including the plaintiff's own testimony.

We agree with the finding of the trial court that all of the replacement papers, which included the various letters and the pamphlet, accurately and adequately informed the plaintiff that PIP coverage was to be discontinued and replaced with other coverage as described. There is nothing in any of these sources which described the new coverages as the "same" coverages as PIP. On the contrary, as above shown, the information available to plaintiff clearly showed what the new coverages would consist of.

This record shows there was no actual confusion or misunderstanding on plaintiff's part. Also, there was no likelihood of confusion by the plaintiff and in fact there was no deception or misunderstanding. There was no violation of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1983, ch. 121½, par. 261 *et seq.*), nor of the Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1983, ch. 121½, par. 312). No genuine issue of material fact is raised so that defendant was entitled to judgment as a matter of law. See *Murphy v. Urso* (1981), 88 Ill. 2d 444, 464, 430 N.E.2d 1079.

Accordingly the judgment of the trial court is affirmed.

McGLOON, J., concurs.

PRESIDING JUSTICE BUCKLEY, dissenting:

I respectfully dissent from that portion of the majority opinion affirming summary judgment for Allstate as to count II, which is based upon violation of the Uniform Deceptive Trade Practices Act (Uniform

Act) (Ill. Rev. Stat. 1983, ch. 121½, par. 312). This court consistently has held that to recover under the Uniform Act a plaintiff need not show any actual confusion or misunderstanding; rather, a plaintiff need only allege and prove that the practices complained of created a "likelihood of confusion." (*Glazewski v. Allstate Insurance Co.* (1984), 126 Ill. App. 3d 401; *Williams v. Bruno Appliance & Furniture Mart, Inc.* (1978), 62 Ill. App. 3d 219, 379 N.E.2d 52.) Clearly, at the very least, a genuine issue of material fact exists in this case as to whether the conduct in question created a "likelihood of confusion."

In order to appreciate how the confusion in this case not only was likely, but rather inevitable and even intentional, it is helpful to review the conduct complained of in its proper context. The record reveals that Allstate decided that effective January 1, 1976, it would no longer offer PIP coverage, which initially had been written in conformity with no-fault principles. This decision was made after Allstate lost a class action suit concerning its offer of PIP coverages on renewals between July 1972 and July 1973. In a memorandum informing its agents of the litigation, Allstate stated: "That decision was against Allstate on a number of grounds, including the judge's opinion that the Illinois No-Fault Law never went into effect and that we inadequately described the situation to our renewal customers." The memorandum warned agents that a possible effect of the law suit might be to return part of the PIP premiums already paid, as well as future premiums collected. Therefore, rather than run the risk of refunding PIP premiums until the appeal of the suit was decided, Allstate opted to discontinue PIP and, to avoid losing customers, the company decided to provide alternative coverages beginning in January 1976. Allstate thereafter sent a letter to its PIP policyholders, signed by its associate vice president Raymond H. Kiefer, informing them of the changeover.

Allstate intercompany memoranda further revealed that renewals for the new alternative or "replacement" coverages were running poorly. Consequently in order to boost sagging renewals,[1] Allstate apparently decided to take a new marketing approach that used confusing and ambiguous language to convey the erroneous impression that the broad protection the policyholders enjoyed under PIP would be continued under the new alternative coverages. Allstate subsequently

---

[1]In addition to Allstate's economic reasons for keeping its renewal customers, the record discloses that its legal department warned that it could not cancel PIP from a policy that had a renewal guarantee.

sent PIP policyholders a second, stronger and more persuasive letter signed by Kiefer, accompanied by an explanatory pamphlet. It is this second Kiefer letter and the pamphlet, referred to as replacement papers, which form the crux of plaintiff's complaint.

The second letter from Kiefer, unlike his first letter, contained the following heading in large bold print:

"Personal Injury Protection Is Being Discontinued—Here's How To Replace It!"

The first paragraph of the letter began:

"When your auto policy is renewed, it will no longer provide any medical, wage loss, or death benefits if you are injured in an auto accident unless you select Option 1 on the enclosed form. Here's why."

The letter continued in part as follows:

"Personal Injury Protection, which is now included in your policy is being discontinued \*\*\*. *This could leave a dangerous gap in your protection. That's why you should seriously consider replacing PIP with the coverage described in the enclosed insert '3 Coverages To Replace Personal Injury Protection.'*" (Emphasis added.)

Kiefer further warned in the letter:

"As you know, hospital costs, physician fees, and other medical costs have jumped dramatically. That's why we are anxious to make sure that you are protected and that your policy includes the coverage you want."

The letter concluded with this postscript:

"P.S. Injuries can be expensive! Why not select Option 1 now and *make sure your protection is continued*!" (Emphasis added.)

The accompanying explanatory pamphlet, as noted in the letter, was entitled:

"3 Coverages to Replace Personal Injury Protection."

The introductory paragraph of the pamphlet stated:

"These coverages can provide protection to replace similar benefits provided under Personal Injury Protection, PIP, which is being discontinued \*\*\*."

Hence, the above replacement papers served to alarm Allstate policyholders that without PIP there would be a financially "dangerous gap" in their insurance protection and that this gap could be remedied by purchasing the replacement coverages. However, after comparing the replacement coverages with PIP, there is no question that PIP provided more extensive benefits and less exclusions than its replacement

policy. The "dangerous gap" that Allstate was so "anxious" about would still remain, even after policyholders purchased the new coverages from Allstate; plaintiff's individual claim is ample proof of that fact. As such, contrary to Kiefer's postscript in his letter, the protection plaintiff enjoyed under PIP was hardly continued.

The majority maintains that the accompanying pamphlet eliminated any misunderstanding. I disagree. The pamphlet, which Kiefer in his letter directs the policyholder to read, is in fact particularly confusing as to the very provision which forms the basis for the claim in the instant case—that pertaining to total disability benefits. The pamphlet describes the total disability benefit as follows:

> "Pays $100 a week if you are injured in an auto accident and cannot work at all."

The misleading nature of the words "cannot work at all" becomes readily apparent when they are read in the context of plaintiff's coverage under PIP. Total disability under PIP was defined as "inability of the injured person to engage in his ordinary occupation." Here, the testimony of Allstate's own physician indicates that plaintiff's injuries prevented him from engaging in his ordinary occupation. While conceding in its brief that plaintiff may have been entitled to the disability benefits in dispute under PIP, Allstate asserts that he is not entitled to those benefits under the "similar" replacement coverage because the words "cannot work at all," which appear in the pamphlet referred to in Kiefer's second letter, actually mean the inability of the injured person to engage "in *any* occupation or employment for wage or profit." (Emphasis added.) Allstate makes much of the fact that this latter, far more concise language appears in the new policy itself; however, this fact does not necessarily insulate Allstate from liability given the misleading nature of Kiefer's letter and the pamphlet which plaintiff allegedly relied upon in deciding to continue his coverage with Allstate. See *Glazewski v. Allstate Insurance Co.* (1984), 126 Ill. App. 3d 401, 410.

It should be noted that the two definitions of total disability under PIP and the replacement coverage can by no means be deemed "similar." In contrast to PIP, under the definition in the new policy it would be virtually impossible to collect total disability benefits after the first year, unless the insured was rendered completely mentally and physically disabled, *i.e.*, a "vegetable," as Allstate apparently would argue that the claimant could always perform some work, no matter how menial and demeaning.

The record of the proceedings below reveals that even the trial court found confusion and misunderstanding as to Allstate's representations in the replacement papers. The court stated that:

"*** there may be some confusion and there may have been some misrepresentation which led to the confusion but I certainly, and I agree with Judge O'Brien, don't think it was fraud.

*  *  *

Yes, but it says 'similar benefit.' There is the confusing word, and you have told me that."

Despite these findings, the trial court ruled that no issue of material fact existed as to whether count II satisfied the standard of the Uniform Act, which requires only a "likelihood of confusion." The above comments indicate that the trial court apparently believed it was necessary to show fraud under the Uniform Act. Such a showing, however, is not required under the language of the Act, nor under case law construing the Act.

Finally, plaintiff is not precluded from recovering damages for violations of the Uniform Act. Section 2 of the Uniform Act is incorporated into section 2 of the Consumer Fraud and Deceptive Business Practices Act. (Ill. Rev. Stat. 1983, ch. 121½, par. 262; *Glazewski v. Allstate Insurance Co.* (1984), 126 Ill. App. 3d 401, 408; *Crinkley v. Dow Jones & Co.* (1978), 67 Ill. App. 3d 869, 874-75, 385 N.E.2d 714.) As we noted in *Glazewski*: "Through the incorporation, the legislature clearly intended to provide consumers with broader protection than initially provided under either act individually and to allow consumers to seek remedies for deceptive practices under the uniform act." (126 Ill. App. 3d 401, 408.) Specifically, section 10a of the Consumer Fraud and Deceptive Business Practices Act provides the statutory basis for the recovery of damages for violations of the Uniform Act. (*Crinkley v. Dow Jones & Co.* (1978), 67 Ill. App. 3d 869, 874-75; Ill. Rev. Stat. 1983, ch. 121½, par. 270(a).) Although plaintiff in this case technically should also have pleaded the Consumer Fraud and Deceptive Business Practices Act as the basis for his monetary relief, *Crinkley* indicates that this is a mere pleading defect which easily can be remedied by filing an amended complaint. Given Illinois' liberal pleading rules (*Dinn Oil Co. v. Hanover Insurance Co.* (1967), 87 Ill. App. 2d 206, 211-12, 230 N.E.2d 702), this minor technical flaw should not prevent plaintiff from seeking damages that he is clearly entitled to claim under the law. Consequently, on remand, I would allow plaintiff to amend his complaint to add the Consumer Fraud and Deceptive Business Practices Act as his basis for relief.