# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-1348

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SETH BONSU, also known as QUINCY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 23-1—**Robert W. Gettleman**, *Judge.*

_____

ARGUED JANUARY 8, 2003—DECIDED JULY 16, 2003

_____


Before FLAUM, *Chief Judge*, and EASTERBROOK and DIANE
P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* After bouncing between
psychiatric diagnoses that found him alternately competent
and incompetent to stand trial, Seth Bonsu was eventually
found competent and tried and convicted by a jury of one
count of conspiring to distribute heroin in violation of 21
U.S.C. § 846, and seven counts of distributing heroin in vio-
lation of 21 U.S.C. § 841. He now insists that the govern-
ment coerced him to testify falsely before the grand jury. In
addition, he argues that there was insufficient evidence to
sustain his conspiracy conviction and that he was improp-

erly denied a reduction in his sentence pursuant to the
"safety valve" provisions of 18 U.S.C. § 3553(f) and U.S.
Sentencing Guidelines (U.S.S.G.) § 5C.1. Finally, he asserts
that he is entitled to a downward departure from the Sen-
tencing Guidelines because his mental illness, which was
eventually diagnosed as brief Psychotic Disorder, an Axis I
diagnosis listed in the American Psychiatric Association's
*Diagnostic and Statistical Manual of Mental Disorders*
(DSM-IV), 302 (4th ed. 1994), was what caused him to cease
cooperating with the authorities and thus his case falls out-
side the "heartland" of cases that the Guidelines contem-
plate. Finding no merit to any of these contentions, we
affirm Bonsu's sentence and conviction.

# I

The son of prominent members of the Ghanian commu-
nity in Chicago, Seth Bonsu strayed from course and chose
to engage in the illegal drug business, despite the fact that
he came close to completing a bachelor's degree in aeronau-
tics at St. Louis University in Missouri. The government
discovered him when it retained a paid informant to en-
snare some Nigerian heroin traffickers. With the help of the
informant, Bonsu sold or delivered small quantities of her-
oin on at least five occasions, not realizing that his custom-
ers were aligned with the government. His career ended on
January 14, 1998, when he attempted to close a major sale
of heroin. Just after he handed over two samples of a prom-
ised four- to six-kilogram batch of heroin, FBI agents
closed in and arrested him. Four to six kilograms was a
large amount for Bonsu, and he had been compelled to piece
together his supplies from a variety of middlemen, none of
whom was willing to furnish the entire amount on his own.
The government relied on the group sale aspect of the deal
to support its charge that Bonsu and the others were in-
volved in a drug conspiracy.

Bonsu's cooperation with the government began the moment he was arrested. As FBI agents listened, he placed a phone call to a co-conspirator from the McDonalds where he had been arrested. The agents also learned valuable information from Bonsu's pager and his address book, both of which they had seized at the time of the arrest. Bonsu continued to cooperate after his arrest by meeting four or five times with the government to proffer information and to place additional phone calls to individuals who soon became co-defendants. All of this preceded Bonsu's grand jury testimony. Before the grand jury, Bonsu read a prepared statement spelling out the details of his drug dealing. His testimony proceeded without incident, and the government and Bonsu then hammered out the details of a plea agreement that put him in the ballpark for a sentence that would have been half of the mandatory minimum ten-year term provided by the statute. That benefit, however, was contingent upon his continued cooperation.

Bonsu was set to testify against his co-conspirators at their trial when things began to unravel. First, Bonsu indicated that he was dissatisfied with the private lawyer whom his family had retained after he fired his public defender (a step he took right before the plea agreement was signed). Then, on the eve of his co-conspirators' trial, Bonsu's privately retained lawyer (Lawyer 2) asked the court to conduct a competency evaluation because of Bonsu's increasingly hostile and irrational behavior. Around this time Bonsu signaled that he was no longer willing to cooperate with the government. Eventually, he filed a *pro se* motion to withdraw his guilty plea, insisting that the government had coerced him into giving untruthful grand jury testimony. The government responded with its own motion to rescind the plea agreement, in light of Bonsu's refusal to continue to cooperate. Bonsu then fired his private lawyer and a new public defender (Lawyer 3) was appointed. This arrangement was short-lived, as Bonsu did not believe that

a defense lawyer who was paid by the government could represent his interests. A second private lawyer (Lawyer 4) was hired by his family, but he too was later replaced by Bonsu's current, court-appointed lawyer (Lawyer 5).

From the time that Lawyer 2 came onto the scene, Bonsu's competency became a central issue. The court responded by ordering a series of competency evaluations that followed a distinct pattern. First, a forensic psychiatrist evaluated Bonsu and concluded that Bonsu suffered from certain personality traits or disorders that made it difficult to work with him, but that he was not incompetent to stand trial. Next, Bonsu's attorney provided information to the evaluating doctor about the quality of the lawyer's relationship with Bonsu, including specific details on the difficulties of discussing his case with him. The examining doctor then reconsidered his initial diagnosis.

The first time this happened, a new doctor, Dr. Eric Woodward of the Isaac Ray Center for Psychiatry and the Law, found that Bonsu suffered from "a delusional disorder, persecutory type" and that he was incompetent to stand trial. The court then held an evidentiary hearing during which conflicting evidence was presented on Bonsu's competency to stand trial. As a result of this hearing, the court ordered Dr. Bernard Rubin, a third doctor, to conduct another competency evaluation. This evaluation initially resulted in Dr. Rubin's diagnosis of an Axis II, personality disorder, which in the doctor's opinion did not meet the legal definition of incompetence to stand trial. Upon receiving further information from Bonsu's lawyer and the Assistant United States Attorney (AUSA) who was prosecuting the case, Dr. Rubin reassessed his initial diagnosis and concluded that Bonsu suffered from brief psychotic disorder, an Axis I diagnosis, which, when aggravated, diminished Bonsu's contact with reality and made it impossible for him to cooperate meaningfully with his lawyer and participate in his own defense. As a result, the court found

Bonsu incompetent at that time to stand trial. On June 21, 2000, Bonsu was ordered transferred to the Federal Bureau of Prisons, Federal Medical Center in North Carolina, where he remained for treatment and assessment until the Mental Health Division of the Center in November 2000, submitted to the district court a Certificate of Restoration of Competency to Stand Trial. The psychiatrist and psychologist who prepared the supporting report concluded that Bonsu "is not now and likely never was severely mentally ill."

During the period in which the court had taken Bonsu's competency to stand trial under advisement, Bonsu himself, his various lawyers, and the government all filed a series of motions to undo the cooperative efforts that had previously led to Bonsu's grand jury testimony and guilty plea. The court ultimately granted Bonsu's motion to withdraw his guilty plea and allowed the government to rescind the plea agreement. As soon as Bonsu was restored to competency and returned from North Carolina, a trial date was set and the case proceeded to trial. The government's case included testimony from Bonsu's former girlfriend, who played a minor role in his heroin dealing, various FBI agents who participated in the events leading up to and including Bonsu's arrest, and extensive testimony from the government's paid informant, who walked the jury through twenty-six tape-recorded conversations with Bonsu. The tapes, which reflected both telephone calls and face-to-face meetings, included many discussions about Bonsu's efforts to orchestrate the interrupted four- to six-kilogram sale.

## II

Bonsu begins with his argument that the district court committed reversible error when it rejected his motion for a reduced sentence pursuant to U.S.S.G. § 5C1.2, and so shall we. The safety valve provision authorizes the district

court to depart from a statutory mandatory minimum sentence for certain offenders who also meet the criteria set forth in 18 U.S.C. § 3553(f)(1)-(5): they must be first time offenders, not in a leadership position, who committed crimes that did not involve violence or threats of violence, or result in death, and they must truthfully have provided the government with all relevant information and evidence that they had concerning their offense. Our review of the district court's denial of Bonsu's motion for a reduced sentence under § 5C1.2 is for clear error. *United States v. Williams*, 202 F.3d 959, 964 (7th Cir. 2000).

Bonsu's argument on appeal begins with the factual proposition that he cooperated fully with the government while he was of sound mind, and ceased his cooperation only when his mental condition deteriorated. Under those circumstances, he continues, it was improper to deny him the benefits of the safety valve provision. As stated in his brief, Bonsu's "belief that he was coerced into reading the affidavit prepared by the government in front of the grand jury would reflect a delusional belief that there was a conspiracy against him." Nevertheless, even if we were to accept the fact that there was a period of time during which his mental condition made it impossible for him to cooperate, this still does not answer the question why he did not resume cooperating once he was restored to competency—and indeed, why he is still continuing to take positions inconsistent with cooperation, such as his argument that his grand jury testimony was false. The district court noted that after Bonsu was restored to competence, he could have acknowledged that his grand jury testimony was correct and accepted the consequences of his conduct. Instead, "[h]e chose as a competent man to continue to deny his criminal involvement in this case and to put the government to its proof." Accordingly, the district judge concluded that it would be wrong to allow Bonsu to benefit from the safety valve, because he did not cooperate in good faith from the

time his competency was restored. Importantly, the district court in no way assumed that a defendant has a duty to cooperate during the time period when he or she is actually incompetent.

Bonsu insists that because the Guidelines say that the safety valve is appropriate where cooperation is forthcoming "not later than the time of the sentencing hearing," U.S.S.G. § 5C1.2(a)(5), he is nonetheless entitled to its benefit. He reasons that because he cooperated fully with the government until he became too ill to continue, and because he eventually offered to resume cooperation, his sentence should have been reduced. Although it is true that Bonsu did offer to resume cooperation after he was restored to competency and before his sentencing hearing, the district court committed no clear error when it found that Bonsu was not entitled to a reduced sentence. It quite reasonably decided to focus on Bonsu's cooperation during the entire time period after he was restored to competency and found fit to stand trial. During this period Bonsu insisted that his grand jury testimony was coerced and untruthful. Bonsu also put the government to its burden at trial after he was restored to competency. These post-restoration facts are not outweighed by Bonsu's belated offer to resume cooperation with the government. If upon restoration to competency Bonsu had decided to reverse course once again and resume cooperation with the government, the district court signaled that it would have given serious consideration to his safety valve arguments. But that is not what he did, and we can find no error in the district court's decision to deny him the benefits of the safety valve guideline. See, *e.g.*, *United States v. Thompson*, 106 F.3d 794, 801 (7th Cir. 1997).

Bonsu also contends that he was improperly denied a downward departure under U.S.S.G. § 5K2.0, which authorizes a district court to depart from a mandatory minimum sentence under the Sentencing Guidelines where there are "aggravating or mitigating circumstances of a kind or de-

gree not adequately taken into consideration by the Commission." *Koon v. United States*, 518 U.S. 81, 94 (1996); U.S.S.G. § 5K2.0; 18 U.S.C. § 3553(b). This provision acknowledges that the Guidelines focus on the "heartland," or typical cases, but leave room for departure (upward or downward) in atypical cases.

We need not devote much attention to this argument because, as the government correctly notes, our court lacks jurisdiction to review the district court's ruling in the first instance. This is so because the district judge in this case fully understood that he had the authority to depart from the Sentencing Guidelines if he believed that such a departure was warranted, but he chose not to depart. See 15B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3918.8, at 576 (2d ed. 1992) ("The courts of appeals all have agreed that a refusal to make a downward departure will not be reviewed beyond the point of ensuring that the district court understood its power to make a departure."). See also *United States v. Crucean*, 241 F.3d 895, 898 (7th Cir. 2001); *United States v. Poff*, 926 F.2d 588, 590 (7th Cir. 1991) (*en banc*); *United States v. Ekeland*, 174 F.3d 902, 906-07 (7th Cir. 1999); *United States v. Franz*, 886 F.2d 973, 981 & n.8 (7th Cir. 1989).

In this case, it is clear that the district court recognized its authority to depart from the Sentencing Guidelines. The court expressed the view that such a departure would have been proper, wholly apart from the proposed plea agreement or any other details of the case, if Bonsu had fully resumed cooperating with the government after he was restored to competency. The court further commented that granting a downward departure without evidence of such continued cooperation would be unjustified. This is precisely the type of discretionary decision that we lack jurisdiction to review.

That leaves two loose ends to tie up. First, Bonsu suggests that the evidence was insufficient to support a conviction on the conspiracy charge. We agree with the government that Bonsu's challenge to the sufficiency of the evidence is forfeited by his lawyer's failure to develop this argument through citation to the relevant portions of the record and supporting authority. *Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1212 (7th Cir. 1993). We add for completeness that sufficiency challenges are notoriously difficult to win in any event, and that the record contains ample evidence on which the jury could have based its verdict in this case.

Finally, we reject Bonsu's remaining argument—that the district court erred in denying his motion to suppress his grand jury testimony on the basis of prosecutorial misconduct. In doing so we note how troubled we are that Bonsu's opening brief to this court failed to concede that the truthfulness of his grand jury testimony and the propriety of the prosecutor's conduct leading up to that testimony was the subject of a full hearing in the district court, and that the district court resolved this issue in the government's favor after that hearing. At the hearing, the district court heard testimony from Bonsu, Paul Flynn, his former public defender, and FBI Agent John Jimenez, the case agent in charge of the investigation. They presented conflicting accounts on three important questions: (1) whether the government used threatening and intimidating tactics in order to secure from Bonsu a version of the events that was favorable to its prosecution of the case; (2) whether Bonsu's lawyer or substitute counsel from the Federal Defender's office was present in the proffer sessions leading up to Bonsu's grand jury testimony and on the day that he actually testified before the grand jury; and (3) whether Bonsu himself chose to read the prepared statement to the grand jury rather than answering questions, and if he chose to read a statement, whether he was given an opportunity to

review his prepared testimony before he had to appear before the grand jury. The district court resolved all three questions against Bonsu.

Moreover, as the government points out in its brief, there was really nothing to "suppress" at the trial itself. The government did not try to introduce the grand jury transcript at the trial before the petit jury. Whatever errors may have occurred before the grand jury became harmless once the petit jury convicted Bonsu. See *United States v. Mechanik*, 475 U.S. 66, 73 (1986). So, for a variety of reasons, we find no merit in this argument either.

### III

For these reasons, we AFFIRM the judgment of the district court.

A true Copy:
       Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*